1    WO

2

3

4

5                 IN THE UNITED STATES DISTRICT COURT

6                     FOR THE DISTRICT OF ARIZONA

7
     Victor Chavarria,                    )    No. CV 11-345-TUC-CRP
8                                         )
                   Plaintiff,             )    **ORDER**
9                                         )
     vs.                                  )
10                                        )
                                          )
11   Carolyn W. Colvin, Acting Commissioner)
     of the Social Security Administration,)
12                                        )
                   Defendant.             )
13                                        )
     _____)
14

15          Plaintiff has filed the instant action seeking review of the final decision of the

16   Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The Magistrate Judge has

17   jurisdiction over this matter pursuant to the parties' consent.  *See* 28 U.S.C. § 636(c).

18   Pending before the Court are Plaintiff's Opening Brief ("Plaintiff's Brief") (Doc. 14),

19   Defendant's Opposition to Plaintiff's Opening Brief ("Defendant's Brief") (Doc. 19), and

20   Plaintiff's Reply (Doc. 22).  For the following reasons, the Court remands the matter for the

21   Commissioner to calculate benefits based upon a finding of disability commencing

22   September 1, 2004.

23   **BACKGROUND**

24          Plaintiff was born on July 28, 1957, has an eighth grade education, is illiterate, and

25   has worked in the past as a mason, construction laborer, and janitor.  (Administrative Record

26   ("AR.") 72,  83,  400, 426, 457; *see also* AR. 233, 400, 545, 555, (Plaintiff began working

27   as a mason at a young age after dropping out of eighth grade)).  In February 2004, Plaintiff

28   filed an application for disability insurance benefits alleging inability to work since March

1, 2001 due to: problems with his back, shoulder, arm, feet, vision, and intestines; chest pain; constant migraines; and numbness in his hands and feet. (AR. 72-74, 82). After a hearing, the ALJ issued a decision denying benefits and the Appeals Council denied Plaintiff's request for review. (AR. 6-8, 11-23). Plaintiff appealed to the District Court for the District of Arizona and, on March 31, 2008, the matter was remanded for further proceedings, including consideration of lay statements from Plaintiff's siblings, the severity of Plaintiff's mental impairments, Plaintiff's credibility, and his claim of illiteracy. (AR. 462-66, 470-92, 493-505). Upon remand, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further proceedings. (AR. 459-61). On January 7, 2009, the ALJ held a hearing where Plaintiff testified. (AR. 659-81). On June 18, 2009, the ALJ issued her decision denying Plaintiff benefits through December 31, 2006, the date he was last insured. (AR. 448-58).

Petitioner sought Appeals Council review. The Appeals Council considered additional medical evidence submitted by Plaintiff as well as "the fact that since the date of the Administrative Law Judge's decision, you were found to be under a disability beginning on July 2, 2009, based on the application you filed on July 2, 2009; however, the Council found this information does not warrant assuming jurisdiction. The current hearing decision addresses the Court's concerns and is supported by substantial evidence." (AR. 438). Consequently, the ALJ's June 18, 2009 decision became the final decision of the Commissioner.

Petitioner then initiated the instant action on the grounds that the ALJ improperly rejected: (1) testimony from Plaintiff's siblings; (2) medical records from Nurse Practitioner McVay; and (3) Plaintiff's symptom testimony. (Plaintiff's Brief). Plaintiff also argues that he is disabled under the grids because he cannot perform light work. (*Id.*).

**STANDARD**

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The

1  factual findings of the Commissioner shall be conclusive so long as they are based upon
2  substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti*
3  *v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the
4  Commissioner's denial of disability insurance benefits when the ALJ's findings are based
5  on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*
6  *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

7          Substantial evidence is "'more than a mere scintilla[,] but not necessarily a
8  preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,
9  873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is
10 "such relevant evidence as a reasonable mind might accept as adequate to support a
11 conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can
12 support either outcome, the court may not substitute its judgment for that of the ALJ."
13 *Tackett*, 180 F.3d at 1098 (*citing Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
14 Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence,
15 resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981
16 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by
17 isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (*quoting*
18 *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the Court must "'consider
19 the record as a whole, weighing both evidence that supports and evidence that detracts from
20 the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.
21 1993)).

22 **DISCUSSION**

23         SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step
24 sequential process. 20 C.F.R. §§404.1520, 416.920. To establish disability, the claimant
25 must show he has not worked since the alleged disability onset date, he has a severe
26 impairment, and his impairment meets or equals a listed impairment or his residual functional
27
28

capacity ("RFC")[1] precludes him from performing past work.  Where the claimant meets his burden, the analysis progresses to step 5 where the Commissioner must show that the claimant is able to perform other work, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.

**THE ALJ'S PERTINENT FINDINGS**

Except to the extent indicated in the 2009 decision, the ALJ "incorporate[d] by reference the exhibits/testimony in the record as well as the credibility/weight given that evidence as of..." the November 18, 2005 decision.  (AR. 451).  In 2009, the ALJ found that through the date last insured, Plaintiff had the following severe impairments: osteoarthritis of the cervical spine; bilateral carpal tunnel syndrome; status post residuals of a benign bladder tumor removal, with temporary use of a colostomy bag; costochondritis; left eye vision problems; and a depressive disorder.  (AR. 453).  In finding Plaintiff was not disabled, the ALJ determined that from March 1, 2001 through August 31, 2004, Plaintiff had no documented, severe medically determinable impairments for the requisite twelve continuous months or more.  (AR. 455).  Thereafter, beginning on September 1, 2004 and continuing through February 28, 2005, Plaintiff "retained the residual functional capacity to perform light-level functioning on a routine and sustained basis (as provided for in 20 CFR [§] 404.1567(b)[)], able to frequently stoop, without any documented postural or environmental limitations, need to avoid wearing heavy chest garments or perform jerking motions with his head (such as using heavy equipment like a jack hammer) that would cause the body to jolt quickly)."  (*Id.*).  From March 1, 2005 through December 31, 2006, Plaintiff "continued to possess the light level functioning identified in the period ending on February 28, 2005, but further limited by manipulative restrictions consisting of the need to avoid repetitive use of the hands, as well as psychological based nonexertional limitations consisting of the inability

---

[1]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

1   to understand, remember, or carry out more than simple one/two step instructions and the

2   inability to perform more than simple repetitive work." (*Id.*). The ALJ concluded that

3   Plaintiff was unable to perform his past relevant work. (AR. 457). Instead, the ALJ

4   determined that through the date last insured, Plaintiff could perform the full range of light

5   work in significant numbers and that "additional limitations [noted in the RFC] had little or

6   no effect on the occupational base of unskilled light work." (AR. 458). Relying on the

7   Medical Vocational Guidelines ("Grids"), the ALJ decided that a finding of "not disabled"

8   was mandated under Rule 202.16. (*Id.*).

9   **LAY TESTIMONY**

10  Plaintiff challenges the ALJ's finding that statements from his brother and sister and

11  Nurse Practitioner McVay were not credible.

12  **Siblings.** The ALJ found that Plaintiff's siblings "were apparently unable to even

13  agree on a variety of issues in their statements. His brother indicated that the claimant was

14  able to leave the house, attend church, and eat at restaurants while his sister described him

15  as a virtual recluse; spending nearly the entire day in his bedroom." (AR. 456 (citing AR.

16  163-71 (brother), 172-80 (sister)).

17  Lay testimony as to a claimant's symptoms is competent evidence which the ALJ

18  must take into account unless he expressly determined to disregard such testimony, in which

19  case he must give reasons that are germane to each witness. *Nguyen v. Chater*, 100 F.3d

20  1462, 1467 (9th Cir. 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).

21  In April 2005, Plaintiff's brother and sister each submitted a function report.

22  Plaintiff's brother reported that he saw Plaintiff once or twice a week and that Plaintiff spent

23  many hours in his room crying, restless and upset. (AR. 163). He indicated that Plaintiff did

24  not have problems with personal care such as bathing and dressing, could not read or write

25  well, attended church on Sunday, and could not lift, squat or bend because of his bad back.

26  (AR. 165-68). In stressful situations, Plaintiff becomes upset, impatient, restless, uneasy.

27  (AR. 169). He is easily frightened and shy. (*Id.*).

28

Plaintiff's sister, with whom Plaintiff lives (AR. 400, 403), stated that Plaintiff stays in his room most of the time, requires reminders to take medication, go to doctor appointments and to bathe, is unable to read, does not socialize at all, goes outside very little "[b]ecause he is depressed with everything that's going on in his life," does not attend church, is unable to sleep, and has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, seeing, memory, stair-climbing, using hands, concentrating, understanding, and following instructions. (AR. 172-77). Plaintiff "never had many social activities, but because of the pain and depression, he has withdrawn from people and family functions." (AR. 177; *see also* AR. 178 ("He won't answer [sic] phone, and doesn't like having company"). Ms. Chavarria also indicated that Plaintiff had problems caring for himself including difficulty tying his shoes, used a chair to shower, could not hold his comb well enough to comb his hair, did not shave and could not hold a toothbrush well enough to brush his teeth. (AR. 173). Ms. Chavarria further stated: "I'm sorry to say, but what it comes down to is that my brother is illiterate. Other than construction work, he never learned how to do any other kind of work. Now with his painful conditions he is unable to do much of nothing." (AR. 173).

Plaintiff's statements in the record include that he experiences constant pain from his back, his depression is worse, and he does not have hobbies. (AR. 128, 134). When asked to describe changes in his social and recreational activities since his disability began, Plaintiff responded that he has experienced a total change because he cannot do anything and now stays to himself. (*Id.*). His depression makes it so that he cannot talk to anyone, "I am very n[auseous,] all I do is cry in my room." (AR. 134; *see also* AR. 127(when asked how he gets along with others, Plaintiff responded that he did not see other people)).

In assessing Plaintiff's mental impairment, the ALJ was required to consider Plaintiff's activities of daily living; social functioning; ability to maintain concentration, persistence and pace; and episodes of decompensation. (AR. 454). When determining that Plaintiff had mild restrictions of activities of daily living, the ALJ pointed to statements from Plaintiff's brother that Plaintiff "experienced no difficulties in performing personal activities,

while his sister indicated he experienced considerable difficulties....While unclear exactly what the activities consisted of, a close review of Dr. Armando Gonzalez' records reveal that the claimant engaged in some form of exercise routine in a successful effort to lose weight and lessen the effects of his diabetes mellitus."  (AR. 454 (*citing* AR. 160-180, 549)).  Plaintiff's brother and sister differed as to whether Plaintiff had difficulty with personal care needs.  However, the record is clear that Plaintiff lived with his sister, while he saw his brother only a few times a week.  Understandably, this difference in the opportunity to observe Plaintiff accounts for a difference in the siblings' opinions. *See Dodrill*, 12 F.3d at 919 ("[a]n eyewitness can often tell whether someone is suffering or merely malingering...this is particularly true of witnesses who view the claimant on a daily basis....").

As to Plaintiff's ability to lose weight, Dr. Gonzalez' treatment note cited by the ALJ reported Plaintiff "has lost 10 pounds due to dieting and exercising and due to the fact that he is taking Cymbalta which seems to be knocking off his appetite which I am okay with as he needed to lose weight." (AR. 549).  Dr. Gonzalez' treatment note does not mention what sort of exercise Plaintiff engaged in to lose weight or how often he exercised, the ALJ does not acknowledge that Cymbalta may have contributed to the weight loss and she cites to no records or testimony about the type or intensity of exercise, nor does the record reflect same. As discussed more fully *infra* when addressing the ALJ's rejection of Plaintiff's credibility, the treatment note does not support rejecting Ms. Chavarria's statements.

When determining that Plaintiff had mild difficulties in social functioning, the ALJ found that Plaintiff socialized with his mother, brother, and sister "without any signs of social isolation or agoraphobia.  His brother reported that the claimant attends church and periodically goes to Subway Sandwich Restaurants....In contrast, his sister reported that the claimant participated in virtually no social activities...."  (AR. 454).    The finding that Plaintiff went out to eat is in error.  (*See* Plaintiff's Brief, p. 44).  Mr.  Chavarria stated that Plaintiff went to church on "Sunday Sabbath", and made no reference to going to Subway restaurants.  (*See* AR. 163-71).  While it is true that Plaintiff's siblings differed as to whether

Plaintiff attended church, the siblings' statements were consistent that Plaintiff lives a virtually isolated life. Apart from the reference to church, there is no indication anywhere in the record that Plaintiff went out alone or with friends or family, had friends over, or otherwise maintained any modicum of a socially active lifestyle. The record does support the ALJ's observation that Plaintiff was able to interact with his mother, sister, and brother. (*See* AR. 400). However, that finding, i.e., that these are the *only* people with whom Plaintiff interacts, supports, rather than detracts from, the conclusion that Plaintiff does indeed live a very isolated life. The conclusion that Plaintiff experienced more than mild limitations in social functioning is also supported by the ALJ's reliance on GAF scores of 55-58 assessed by Plaintiff's treating psychiatrist Dr. S. Frembgen, which the ALJ acknowledged indicate at least moderate impairment in social functioning. (AR. 457). Moreover, as discussed *infra,* Nurse McVay, whose opinion the ALJ improperly discredited, also indicated that Plaintiff had poor or no ability to deal with the public and was "isolative [and] very quiet." (AR. 5B-5D).

Elsewhere in the decision, the ALJ discounted Ms. Chavarria's credibility because she "claimed a level of debility, presumably secondary to mental impairment(s), that could not be supported by the clinical notes prepared by the claimant's mental health provider(s). Rather than needing reminders to take his medications, a close review of the treatment notes from both Dr. Gonzalez and La Frontera clearly indicate that the clamant's failure to take his medications as prescribed was quite volitional on the claimant's part (possibly due to expense) rather than secondary to poor memory." (AR. 456-57). The ALJ does not cite specific records to support this finding. Review of the record reflects that some of Plaintiff's medications were denied or changed due to insurance reasons (*see* AR. 354, 638, 674). In one instance in May 2006, Plaintiff told Dr. Gonzalez he had not been taking Lescol for high cholesterol and Dr. Gonzalez told him to take the medication as instructed. (AR. 549). Additionally, in November 2005, Plaintiff started taking Cymbalta. (AR. 633). In February, 2006, Plaintiff reported taking Cymbalta as directed and received a re-fill. (AR. 634). A May 5, 2006 La Frontera treatment note indicated that Plaintiff had been off of his

medication for two months, and Cymbalta and Risperdal were prescribed. (AR. 635). In July 2006, Plaintiff's Cymbalta dosage was increased. (AR. 636). In October 2006, La Frontera records indicate that Plaintiff was off Cymbalta due to an insurance problem." (AR. 638).

"'[D]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds.'" *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir. 1995)). Thus, the Ninth Circuit has "proscribed the rejection of a claimant's complaints for lack of treatment when the record establishes that the claimant could not afford it." *Regenniter v. Commissioner of Social Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999). The ALJ did not inquire as to the reason why Plaintiff was off of his medication in the spring of 2006. The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay...." *Orn,* 495 F.3d at 638 (*quoting* SSR 96-7p). Further, Plaintiff's two-month lapse in taking medication in 2006 does little to undercut his sister's statements made in 2005. The ALJ is correct that beginning in May 2007 through 2008, Plaintiff reported to La Frontera staff that he no longer wanted to take medication for depression because he was getting adjusted, no longer needed it, and was "already tak[ing] too many pills." (AR. 641-43). However, this volitional non-compliance occurred long after his sister's statements and long after the date last insured. The reasons stated for discounting Ms. Chavarria's credibility regarding the limiting effects of Plaintiff's depression are not supported by substantial evidence in the record.

**Nurse McVay.** On May 4, 2006, Nurse Practitioner Ellen McVay, RN, MS, ANP-C, who treated Plaintiff at La Frontera, submitted a Medical Assessment of Ability to do Work-Related Activities (Mental) wherein she indicated that since "[p]robably 2000", Plaintiff was profoundly depressed, "isolative [and] very quiet", unable to concentrate, and unable to function in the workplace. (AR. 5B-5D). She also indicated that Plaintiff had poor or no

1  ability to deal with the public, deal with work stresses, function independently, and

2  understand or remember complex job functions.  (*Id.*).

3        Because Nurse McVay is not an "acceptable medical source" under the regulations,

4  the ALJ properly treated her opinion as a lay opinion.[2]  *See* 20 C.F.R. §404.1513(d)(1).  The

5  ALJ rejected Nurse McVay's opinion because notes from La Frontera treating psychiatrist,

6  S. Frembgen, D.O., "suggest a much higher level of functioning; given GAF scores that

7  ranged between 55-58; consistent with only a moderate impairment in social functioning."

8  (AR. 457).  The ALJ also pointed out that La Frontera staff and Dr. Gonzalez had reported

9  improvement with anti-depressants and that Plaintiff had stopped taking his prescribed anti-

10  depressant medication from approximately March 2006 until December 2008.  (*Id.*).

11        On June 21, 2004, Plaintiff presented to Southern Arizona Mental Health Corporation

12  ("SAMHC") upon referral from a "community agency" with complaints of chronic pain and

13  depression.  (AR. 267-68, 282).  Plaintiff reported he had been unable to work since

14

---

15       [2]The Social Security Administration recognizes that "[w]ith the growth of managed

16  health care in recent years and the emphasis on containing medical costs, medical sources

17  who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the

18  treatment and evaluation functions previously handled primarily by physicians and psychologists."  SSR 06-03P, 2006 WL 2329939 at *3.  Therefore,

19        depending on the particular facts in a case, and after applying the factors for

20        weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable

21        medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical

22        source who is not an "acceptable medical source" if he or she has seen the

23        individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving

24        more weight to the opinion from a medical source who is not an "acceptable

25        medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and

26        SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source

27        Medical Opinions."

     *Id.* at *5.

28

1   undergoing operations in 2002, he suffers from back pain, and has been experiencing

2   symptoms of depression for two years.  (AR. 269-70).  He stated that he felt helpless and

3   useless, there is nothing he enjoyed doing anymore, and he spent most of his time in his

4   room.  (AR. 269).  SAMHC crises staff assessed a GAF of 60 and diagnosed depressive

5   disorder NOS and mood disorder due to chronic back pain with depressive features.  (AR.

6   283-84; *see also* AR. 282 (Plaintiff presented "as soft spoken and withdrawn.")).  In

7   September 2004, Plaintiff complained about forgetfulness and dysarthira to Nurse

8   Practitioner Shannon Sealey, who worked with Dr. Gonzalez.  (AR. 367).  In October 2004,

9   Nurse Sealey indicated that Plaintiff scored 21 out of 30 on a mini-mental status exam, and

10  recommended a consultation with Dr. Valdivia, a neurologist.  (AR. 364).  In December

11  2004, Dr. Gonzalez noted that Plaintiff saw Dr. Valdivia "for a possible dementia work up",

12  Dr. Valdivia felt that Plaintiff was "more depressed than anything else...", and when Dr.

13  Gonzalez asked Plaintiff about same, Plaintiff stated that "he is depressed about the fact that

14  he is unable to work and about his life in general."  (AR. 359).  Dr. Gonzalez prescribed

15  Lexapro.  (*Id.*).  In July 2005, Plaintiff sought mental health treatment at La Frontera where

16  Dr. Frembgen diagnosed Plaintiff with adjustment disorder with depression and anxiety and

17  assessed a GAF for the past year of 55 and a current GAF of 55.  (AR. 629).  In July 2006,

18  when taking Cymbalta and Risperdal, Plaintiff was assessed a GAF of 55.  (AR. 636).

19      Defendant points out that at La Frontera, Plaintiff was prescribed medication and he

20  reported feeling better and that his depression had improved while taking medication.[3]  Yet,

21  such comments about improvement "must be read in context of the overall diagnostic

22  picture...."  *Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001).  That a person who

23  suffers from severe psychiatric issues  "makes some improvement does not mean that the

24  person's impairments no longer seriously affect [his] ability to function in a workplace."  *Id.*

25

26      [3]The ALJ also cited Plaintiff's non-compliance in taking anti-depressants. (AR. 457).
    As discussed *supra* when addressing Ms. Chavarria's statements, the Court disagrees with

27  the ALJ's assessment regarding the time period prior to December 2006,  the date Plaintiff

28  was last insured.

1   Plaintiff persuasively points out that despite treatment with medications and psychotherapy,
2   he was assessed the same GAF score of 55[4] in July 2005 and July 2006.  Moreover, despite
3   taking medication prescribed by Dr. Gonzalez and providers at La Frontera, Plaintiff still
4   complained about depression, difficulty concentrating, lack of energy, and sadness.  (*See e.g.*
5   AR. 627, 636).  The ALJ acknowledged that Plaintiff was assessed GAF scores suggesting
6   moderate limitations in social functioning, yet ignored lay testimony about Plaintiff's
7   difficulties in social functioning and ultimately found only mild limitations in this area.  (AR.
8   454, 457).  Nurse McVay's opinion and the other lay testimony of record that was improperly
9   discredited is consistent in that Plaintiff's mental impairments resulted in limitations in social
10  functioning such that Plaintiff is unable to deal with the public and seeks social isolation.
11  The lay testimony is also consistent that Plaintiff's depression resulted in sadness, decreased
12  energy, and, together with his chronic back pain, in an inability to concentrate.

13  **PLAINTIFF'S CREDIBILITY**

14      Plaintiff challenges the ALJ's finding that  although his medically determinable
15  impairments could reasonably be expected to cause his alleged symptoms, his "statements
16  concerning the intensity, persistence and limiting effects of these symptoms are not credible
17  to the extent they are inconsistent with the..." ALJ's RFC assessment.  (AR. 456).

18      When assessing a claimant's credibility, the "ALJ is not required to believe every
19  allegation of disabling pain or other non-exertional impairment."  *Orn,* 495 F.3d at 635
20  (internal quotation marks and citation omitted). However, where, as here, the claimant has
21  produced objective medical evidence of an underlying impairment that could reasonably give
22  rise to the symptoms and there is no affirmative finding of malingering, the ALJ's reasons

23

24      [4]A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and
25  circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
    occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
26  *Diagnostic and Statistical Manual of Mental Disorders*, p.32 (4th ed.). "[C]ourts have
    specifically held that a GAF score does not directly correlate to disability."  *Vose v. Astrue,*
27  2007 WL 4468720, *17  (D.Ariz. Dec.17, 2007) (citations omitted)); *see also* 65 Fed.Reg.
28  50746, 50764–65 (Aug. 21, 2000) .

1   for rejecting the claimant's symptom testimony must be clear and convincing.  *Carmickle v.*
2   *Commissioner, Social Security Admin.,* 533 F.3d 1155, 1160-61 (9th Cir. 2008). "The ALJ
3   must state specifically which symptom testimony is not credible and what facts in the record
4   lead to that conclusion."  *Smolen v Chater,* 80 F.3d 1273, 1284 (1996); *see also Orn,* 495
5   F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why
6   the testimony is unpersuasive). The ALJ may consider ordinary techniques of credibility
7   evaluation, such as the claimant's reputation for lying, prior inconsistent statements about
8   the symptoms, and other testimony from the claimant that appears less than candid;
9   unexplained or inadequately explained failure to seek or follow a prescribed course of
10  treatment; the claimant's daily activities; the claimant's work record; observations of treating
11  and examining physicians and other third parties; precipitating and aggravating factors; and
12  functional restrictions caused by the symptoms. *Lingenfelter v. Astrue ,* 504 F.3d 1028, 1040
13  (9th Cir. 2007); *Robbins v. Social Sec. Admin.,* 466 F.3d 880, 884 (9th Cir. 2006); *Smolen,* 80
14  F.3d at 1284.

15          The ALJ first pointed out that "[t]reating sources report that [Plaintiff] has been quite
16  successful via diet and exercise to lose weight and lessen the effects of his diabetes mellitus."
17  (AR. 457).   In May 2006, Dr. Gonzalez noted that Plaintiff "has lost 10 pounds due to
18  dieting and exercising and due to the fact that he is taking Cymbalta which seems to be
19  knocking off his appetite which I am okay with as he needed to lose weight." (AR. 549; *see*
20  *also* AR. 548 (Plaintiff weighed 226 pounds at the May appointment)).  Dr. Gonzalez'
21  treatment note does not mention what type of exercise Plaintiff engaged in to lose weight or
22  how often he exercised, the ALJ cites to no records or testimony about the type or intensity
23  of exercise, nor does the record reflect same. The Ninth Circuit has "repeatedly asserted that
24  the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping,
25  driving a car, or limited walking for exercise, does not in any way detract from [his or] her
26  credibility as to [his or] her overall disability.  One does not need to be 'utterly incapacitated'
27  in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting
28  *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)).  Further, "activities such as walking in the

1  mall and swimming are not necessarily transferable to the work setting with regard to the

2  impact of pain. A patient may do these activities despite pain for therapeutic reasons, but that

3  does not mean [he or] she could concentrate on work despite the pain or could engage in

4  similar activity for a longer period given the pain involved." *Id.* Moreover, by August 2006,

5  Plaintiff had gained weight, weighing in at 231 pounds. (AR. 546-47). In November 2006,

6  he weighed 232 pounds and was diagnosed with uncontrolled type II diabetes. (AR. 544-45).

7       The ALJ also found that Plaintiff's "chest pain reportedly resolved by January 2006,

8  and osteoarthritic pain improved to the point that it was stable and only mild to moderate in

9  severity." (AR. 547). She cites a treatment note suggesting that Plaintiff "might have even

10  returned to work as a mason." (*Id.*). In the fall of 2004, Plaintiff began complaining about

11  chest pain. (AR. 365). Cardiologist David Lapan, M.D., determined that the pain was not

12  cardiac-related, but musculoskeletal. (AR. 358; *see also* 658 (Dr. Lapan noting "[i]t is

13  clearly costochondral.")). Plaintiff's complaints of chest pain continued through March and

14  April 2005. (AR. 347, 352). In May 2005, Dr. Lapan began to administer trigger point

15  injections. (AR. 181; *see also* AR. 557, 558 (in June and August 2005, Plaintiff continued

16  to complain about chest pain despite undergoing injections)). In September 2005, Plaintiff

17  reported continued chest pain, and Dr. Gonzalez prescribed Tramadol and Prednisone in

18  place of Naproxen. (AR. 555). In October 2005, Plaintiff told Dr. Lapan he was "[s]till

19  having chest pain, but it is much less." (AR. 657). By November 2005, Plaintiff was taking

20  Naprosyn and Cymbalta, and Dr. Lapan noted Plaintiff was "[f]inally doing well. Very

21  happy with things. Really having almost no pain," (AR. 656; *see also* AR 553 (Dr. Gonzalez

22  noting in November 2005 that Plaintiff was doing well with Cymbalta, Prednisone and

23  Tramadol)). In January 2006, Dr. Lapan noted that Plaintiff was "[m]uch improved. Still

24  has the discomfort but is level one and he much less anxious about it." (*Id.*). But by

25  February 2006, Plaintiff had returned to Dr. Gonzalez complaining of chronic

26  costochondritis, which Dr. Gonzalez treated with Tramadol and Prednisone. (AR. 551).

27  Contrary to the ALJ's statement, the record as a whole does not support the conclusion that

28  Plaintiff's costochondritis resolved by January 2006; instead, although Plaintiff had some

1    brief relief, he continued to complain of pain and seek treatment for same beyond January

2    2006.

3          Additionally, while the objective medical evidence was that Plaintiff's osteoarthritis

4    was mild to moderate in severity, Plaintiff nonetheless consistently continued to complain

5    about chronic pain which Dr. Gonzalez attributed to "over use[]" due to Plaintiff's work as

6    a mason beginning at an early age and "he has a lot of wear and tear despite the fact that he

7    is only 49."(AR. 545; *see also* AR. 233 ("obvious DJD from overuse"), AR. 547 (noting

8    Plaintiff complaints of pain "mostly due to arthritis and overuse.  He has been working as a

9    laborer since he was about 12 or 13 years of age.  He is now 49, but he actually looks much

10   older than 49")).  The fact that diagnostic tests showed only mild to moderate osteoarthritis,

11   cannot, alone, be used to undercut Plaintiff's pain testimony given that "a claimant need not

12   present clinical or diagnostic evidence to support the severity of his pain, *Gonzalez v.*

13   *Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990) (stating that 'it is the very nature of excess pain

14   to be out of proportion to the medical evidence'), a finding that the claimant lacks credibility

15   cannot be premised wholly on a lack of medical support for the severity of his pain." *Light*

16   *v. Social Security Admin.,* 119 F.3d 789, 793 (9th Cir. 1997) (citations omitted).

17         Nor is there clear and convincing support for the conclusion that Plaintiff worked

18   during the relevant time period.  The ALJ referred to a note from Nicole Canglia, P.A.-C.,

19   to whom Plaintiff presented with complaints of urinary frequency in November 2008,

20   indicating: "Low back pain.  The patient works as a mason and has had increased low back

21   pain and stiffness for the past several weeks...."  (AR. 529).  Plaintiff asserts that he "has not

22   worked since March 1, 2001; he had previous work experience as a mason, and when he

23   could no longer do that work, he briefly worked as a janitor."  (Plaintiff's Brief, p. 49).

24   Plaintiff was not questioned about this note at the 2009 hearing.  There is no support in the

25   record that  Plaintiff was actually working in 2008, after the date last insured.  Further, even

26   if Plaintiff may have attempted work, the treatment note shows he suffered back pain as a

27   result.  Moreover,  "the fact that a person holds down a job doesn't prove that he isn't

28

1    disabled, because he may have a careless or indulgent employer or be working beyond his

2    capacity out of desperation." *Henderson v. Barnhart,* 349 F.3d 434, 435 (7th Cir. 2003).

3            The ALJ also found that Plaintiff's complaints that his carpal tunnel syndrome had

4    gotten worse after surgery in 2005 was not believable because the objective medical evidence

5    did not support such a claim and "[h]ad the pain and limited upper extremity use been as bad

6    as the claimant testified...he should have said something either to the surgeon or Dr.

7    Gonzalez." (AR. 457).  March 2005 nerve conduction studies showed Plaintiff had mild

8    bilateral carpal tunnel syndrome. (AR. 351).  In May or June of 2005, Plaintiff underwent

9    a carpal tunnel release procedure for each hand. (AR. 664-65).  In September 2005 when

10   treating Plaintiff for costochondritis, Dr. Lapan noted that Plaintiff "had the hand surgery

11   without a problem and the wound is healing well." (AR. 657).  Although Plaintiff asserts

12   that "there was medical evidence that his wrists were bothering him after the surgery"

13   (Plaintiff's Brief, p. 50), he does not cite any such record, nor are complaints about carpal

14   tunnel issues to providers readily apparent in the record. The ALJ's point is valid. Plaintiff's

15   failure to complain about debilitating issues related to carpal tunnel syndrome post-surgery

16   or to seek treatment for same undermines his credibility.

17   **CONCLUSION**

18           Plaintiff requests that the Court grant benefits. (Plaintiff's Brief, p. 52).  "'[T]he

19   decision whether to remand the case for additional evidence or simply to award benefits is

20   within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989)

21   (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for further

22   administrative proceedings is appropriate if enhancement of the record would be useful."

23   *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d

24   1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate

25   where:

26           (1) the ALJ failed to provide legally sufficient reasons for rejecting the
             evidence; (2) there are no outstanding issues that must be resolved before a
27           determination of disability can be made; and (3) it is clear from the record that
             the ALJ would be required to find the claimant disabled were such evidence
28           credited.

1    *Benecke,* 379 F.3d at 593(citations omitted).   Where the test is met, "we will not remand

2    solely to allow the ALJ to make specific findings....Rather, we take the relevant testimony

3    to be established as true and remand for an award of benefits." *Id.* (citations omitted).

4          Plaintiff argues that a preponderance of the evidence, including the improperly

5    discredited lay evidence from his siblings and Nurse McVay, supports the conclusion that

6    he  had a maximum residual functional capacity of less than light work and that under the

7    Grids, a finding that he could do only sedentary work mandates a finding that he is disabled.[5]

8    (Plaintiff's Brief, p. 51; Reply, p. 4).

9          The ALJ's 2005 RFC assessment is different from the 2009 RFC assessment on

10   remand only to the extent that in the 2009 decision, the ALJ added psychologically-based

11   limitations for the period from March 1, 2005 through December 31, 2006. (*See* Defendant's

12   Brief, p. 11 n. 7 (noting that the ALJ's RFC assessment was the same in both decisions but

13   for the addition of mental limitations)). Another significant difference between the 2005 and

14   2009 decisions is that in 2009, the ALJ determined that Plaintiff was illiterate. (*See* AR. 463-

15   66, 493-505 (remanded by the Court, in part, to reassess Plaintiff's claim of illiteracy and

16   mental impairments)).   In the 2005 decision, the ALJ acknowledged that Plaintiff's

17   "additional nonexertional limitations do not allow him to perform the full range of light

18   work...." (AR. 22). At the 2005 hearing, the ALJ called upon a vocational expert ("VE") to

19   testify as to whether a significant number of light-work jobs existed that Plaintiff could

20   perform, and the ALJ relied on that testimony in satisfying the Commissioner's burden to

21   establish that other work existed that Plaintiff could perform.[6]

22

23          [5]Plaintiff points out that in April 2005 Dr. Gonzalez indicated he could do sedentary

24   work only.  (Opening Brief, p. 51).  Defendant aptly counters that Plaintiff has not
     challenged the ALJ's rejection of Dr. Gonzalez' April 2005 opinion. (Defendant's Brief, p.

25   24).

26          [6]The ALJ indicated that based upon the VE's testimony, from September 1, 2004

27   through February 28, 2005, Plaintiff could work as a housekeeper (DOT 323.687-014),
     parking lot attendant (DOT 915.473.010)(with 50% job base erosion allowing for money

28   handling given Plaintiff's mathematical skills), and assembler (DOT 729.384-010) (with 50%

1        In the 2009 decision, the ALJ applied Grid rule 202.16 to determine Plaintiff was not

2  disabled.  (AR. 458).  She also stated that "the additional limitations had little or no effect

3  on the occupational base of unskilled light work.  A finding of 'not disabled' is therefore

4  appropriate under the framework of this rule."  (*Id.*). The ALJ did not call upon a VE in

5  2009.

6        "There are two ways for the Commissioner to meet the burden of showing that there

7  is other work in 'significant numbers' in the national economy that claimant can do: (1) by

8  the testimony of a vocational expert, or (2) by reference to the Medical-Vocational

9  Guidelines...."  *Lounsburry v. Barnhart,* 468 F.3d 1111, 1114 (9th Cir. 2006).  Use of "the

10  grids will be inappropriate where the predicate for using the grids–the ability to perform a

11  full range of either medium, light or sedentary activities–is not present."  *Burkhart v. Bowen,*

12  856 F.2d 1335, 1340 (9th Cir. 1988); *see also  Hoopai v. Astrue,* 499 F.3d 1071, 1075 (9th Cir.

13  2005) ("the grids are inapplicable when a claimant's non-exertional limitations are

14  'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's

15  exertional limitations."); SSR 83-14, 1983 WL 31254.  In 2005, the ALJ acknowledged that

16  that beginning September 1, 2004, Plaintiff was unable to provide the full range of light work

17  and, to that end, the ALJ relied on VE testimony in 2005 to establish that Plaintiff could

18  work.  (*See* AR. 21, 22 (2005 decision stating "[a]lthough the claimant's additional

19  nonexertional limitations *do not allow him to perform the full range of light work*..." and

20  relying on VE testimony to show jobs Plaintiff could perform after September 1, 2004)

21  (emphasis added)).

22  ───────────────────

23  job base erosion given Plaintiff's limited ability to write).  (*See* AR. 22, 428-33). However,

24  the VE was clear that housekeeping would be eliminated if the claimant was unable to perform jerking motions with the head and use machinery that would jolt the body, due to

25  vacuuming or mopping.  (AR. 430-31 ("the vast majority [of such jobs] are going to involve either vacuuming or mopping"; *see also* AR. 22, 455 (ALJ added such limitations beginning

26  September 1, 2004)).   From March 1, 2005 through November 18, 2005 (the date of the

27  ALJ's first decision), Plaintiff could work as a parking lot attendant and restaurant host (DOT 310.137-010) (with 50% job base erosion to eliminate excess writing)  (AR. 22, 428-

28  33).

In 2009, the ALJ found Plaintiff was illiterate and had psychologically-based limitations; yet, she made the determination that Plaintiff was not disabled without seeking VE testimony. This, in itself, constituted error given that the ALJ had already determined that even without these limitations Plaintiff could not perform the full range of light work and previously called upon a VE; yet, she did not call upon a VE in 2009 after finding additional limitations not previously included in the hypothetical questions posed. *See Embrey v. Bowen,* 849 F.2d 418, 422 (9th Cir. 1988) (if the hypothetical posed to the VE does not reflect *all* of the claimant's limitations, the VE's "opinion has no evidentiary value and cannot support the ALJ's decision."). Further, the psychological limitations included in the 2009 RFC assessment failed to take into account the improperly rejected testimony from Nurse McVay and Plaintiff's siblings, including that Plaintiff has poor or no ability to deal with the public and lives a very socially isolated lifestyle, which the Court credits as true.[7] Moreover, any error cannot be said to be harmless given that the two jobs, parking lot attendant and restaurant host, cited by the ALJ for the period between March 1, 2005 through November 18, 2005 (AR. 22), require the ability to deal with people. *See* 1991 WL 672671 (DOT 310.137-010 for restaurant host); 1991 WL 687865 (DOT 915.473-010 for parking lot attendant). Additionally, restaurant host also requires a reasoning level of 4[8], which arguably

_____

[7]The Court does not credit Nurse McVay's statement that Plaintiff's mental limitations began in 2000, because the substantial evidence of record does not support such a finding. Plaintiff initially presented for treatment at SAMHC for depression on June 21, 2004 with a GAF assessment of 60; he was prescribed Lexapro by Dr. Gonzalez in December 2004; and also sought treatment at La Frontera in July 2005, where he was assessed with a current GAF score of 55, and a GAF score of 55 for the prior year. The substantial evidence of record is that Plaintiff's psychologically-based impairments commenced on or about June 21, 2004.

[8]Reasoning levels range from Level 1 to Level 6, with Level 6 being the highest. *See Gonzales,* 2012 WL 14002 at *9 (citing DOT, 1991 WL 688702). A reasoning level of 4 requires the worker to apply principles of rational systems, such as bookkeeping, to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists, and to interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. *Dictionary of Occupational Titles,* Appendix C, 1991

requires abilities beyond work limited to simple one/two step instructions to which the ALJ limited Plaintiff in 2009, *see e.g. Gonzales v. Astrue,* 2012 WL 14002, *13 (E.D. Cal. Jan. 4, 2012) (refusing to conclude that limitation to one-to-two step instructions encompasses DOT reasoning level above level 2); *Etter v. Astrue,* 2010 WL 4314415, *6-*7 (C.D. Cal. Oct. 22, 2010) (same), and also requires a language level of $4^9$ which would not accommodate an illiterate worker such as Plaintiff. *See* 1991 WL 672671 (DOT 310.137-010 for restaurant host). Likewise the job of assembler identified by the ALJ for the RFC assessment pertaining to September 1, 2004 through February 28, 2005 (*see* AR. 21), requires a level $3^{10}$ reasoning ability in addition to level $2^{11}$ language ability which arguably precludes an illiterate worker limited to carrying out no more than simple one/two step instructions and who is unable to perform more than simple repetitive work, *see e.g. Gonzales,* 2012 WL 14002 at *13; *Etter,* 2010 WL 4314415 at *6-*7. 1991 WL 679706 (DOT 729.384-010 for assembler). At best, the record supports the conclusion that Plaintiff

---

WL 688702.

[9]A language level of 4 includes reading novels, poems, newspapers, periodicals, journals manuals, dictionaries, thesauruses, and encyclopedias. *Dictionary of Occupational Titles,* Appendix C, 1991 WL 688702.

[10]A reasoning level of 3 requires the worker to "[a]pply commonsense understanding to carry out instructions furnished in written oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Dictionary of Occupational Titles,* Appendix C, 1991 WL 688702. Whereas, a reasoning level of 2 requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *Id.* Additionally, a reasoning level of 1 requires the worker to "[a]pply commonsense understanding to carry out simple one-or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*

[11]A language level of 2 includes a passive reading vocabulary of 5,000-6,000 words, reading at the rate of 190-215 words per minute; reading adventure stories and comic books; looking up unfamiliar words in the dictionary for meaning, spelling, and pronunciation; and reading instructions for assembling model cars and airplanes. *Dictionary of Occupational Titles,* Appendix C, 1991 WL 688702.

1    may have been able to work as a parking lot attendant from March 1, 2001 to June 20, 2004,

2    prior to imposition of Plaintiff's psychologically-based limitations. *See* 1991 WL 687865

3    (DOT 915.473-010 indicating parking lot attendant requires a reasoning level of 2 and

4    language level of 1). Additionally, Plaintiff may have been able to work as a housekeeper,

5    from March 1, 2001 through August 31, 2004[12], as that job does not involve dealing with

6    people and requires a reasoning level of 1 and a language level of 1.[13] 1991 WL 672873

7    (DOT 323.687-014 for cleaner, housekeeping).; *see also* (AR. 430-31 (VE testimony that

8    limitations added as of September 1, 2004 would eliminate housekeeping). At this point, the

9    Commissioner has failed to identify any light or other level work that Plaintiff can perform

10   beginning September 1, 2004. *See Tackett,* 180 F.3d at 1095 (the Commissioner bears the

11   burden of showing the plaintiff can do other work). As Plaintiff points out, if he is relegated

12   to sedentary work, the Grids require a finding of disabled.

13          Despite having the duty to call a VE in 2009, the ALJ failed to do so. Plaintiff's

14   application for benefits has been pending for ten years. The ALJ has already reconsidered

15   Plaintiff's case once upon remand from this Court. The Ninth Circuit has recognized that

16   "[r]emanding a disability claim for further proceedings can delay much needed income for

17   claimants who are unable to work and are entitled to benefits, often subjecting them to

18   'tremendous financial difficulties while awaiting the outcome of their appeals and

19   proceedings on remand.'" *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health*

20

21          [12]As to Plaintiff's ability to work between March 1, 2001 and August 31, 2004, even

22   crediting the lay testimony, the substantial evidence as a whole does not reflect that Plaintiff
     suffered from limitations that prevented him from performing the full range of light work

23   during that time. The ALJ accounted for the siblings' description of Plaintiff's physical

24   limitations by acknowledging that he could not return to his past work, which was considered
     to be of medium exertional level.

25

26          [13]A language level of 1 includes recognizing 2,500 words, read at a rate of 95-120

27   words per minutes, and comparing similarities and differences between words and between
     series of numbers. *Dictionary of Occupational Titles,* Appendix C, 1991 WL 688702.

28

1  *and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988)); *see also Terry v. Sullivan,* 903

2  F.2d 1273 (9th Cir. 1990) (remanding for an award of benefits where the plaintiff applied

3  almost four years prior); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir. 1993) (remanding for an

4  award of benefits where plaintiff, who was disabled under the Act, "ha[d] been waiting for

5  well over four years for his disability benefits").   On the instant record, "remanding for

6  further administrative proceedings would serve no useful purpose and would unnecessarily

7  extend...[Plaintiff's] long wait for benefits." *Benecke*, 379 F.3d at 595.

8          Accordingly, for the foregoing reasons,

9          IT IS ORDERED that this matter is REMANDED for the Commissioner to calculate

10  benefits based upon the finding of disability commencing September 1, 2004.

11          The Clerk of Court is DIRECTED to enter judgment and close this case.

12          DATED this 28th day of March, 2014.

13

14  _____

15  **CHARLES R. PYLE**
    **UNITED STATES MAGISTRATE JUDGE**

16

17

18

19

20

21

22

23

24

25

26

27

28

- 22 -